UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:22-mj-143 |
| HATCHET M. SPEED | ) |
| | ) |
| Defendant. | ) |

**MOTION FOR CONDITIONS OF RELEASE**

The defendant, Hatchet M. Speed, is scheduled to come before the Court for an initial appearance after being arrested for offenses related to his participation in the breach of the U.S. Capitol on January 6, 2021. The Government will not be requesting pretrial detention in this case. But to protect the safety of the community, the Government requests that the Court impose specific conditions of release to ensure that Speed does not have access to firearms and to safeguard against the risk that he engages in violence during the pendency of this case. Specifically, the Government requests that the Court order the following conditions of release: (1) that Speed be subject to home detention with location monitoring; (2) that Speed be prohibited from possessing a firearm, destructive device, or other dangerous weapon; (3) that Speed be prohibited from residing at a location in which firearms, destructive devices, or other dangerous weapons are located; and (4) that Speed not return to his residence or storage unit until his firearms are identified and collected by Pretrial Services and/or law enforcement. As demonstrated below, these conditions are necessary in light of Speed's statements and conduct showing that he poses a threat of violence to the community.

## BACKGROUND

Speed is a resident of the Eastern District of Virginia. He was recently employed by a cleared defense contractor for the U.S. Department of Defense and other federal agencies. To the government's knowledge, Speed is currently unemployed. He is a Petty Officer First Class (E-6) in the United States Naval Reserves and holds a Top Secret/Sensitive Compartmented Information (TS//SCI) clearance.

Speed has been charged by criminal complaint with four misdemeanor offenses related to his participation in the incursion at the U.S. Capitol on January 6, 2021: violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). Federal law enforcement agents arrested Speed on June 22, 2022, in McLean, Virginia.

On the same day, agents searched Speed's house, vehicles, person, and storage unit, pursuant to search warrants in the Eastern District of Virginia that authorized the seizure of evidence of a violation of the National Firearms Act, 28 U.S.C. § 5861, and Speed's participation in the Capitol breach, among other items. During the search, agents seized eight firearms and seven suppressors. Agents found, but did not seize, three of Speed's firearms from his residence and two from his storage unit, because they determined that the search warrant did not authorize them to seize these weapons. These firearms remain at Speed's residence and storage unit. Other evidence suggests that Speed has three additional suppressors, which agents did not find during the search. In addition, agents found approximately 25 other firearms belonging to Speed's housemates, but they determined that the search warrant did not permit them to seize the weapons.

Because the cut-off for Speed to appear in magistrate court in either the Eastern District of Virginia or the District of Columbia had passed by the time that Speed was arrested and

processed, Speed's initial appearance will be in this district on June 23, 2022, pursuant to Federal Rule of Criminal Procedure 5(c)(2)(B)(i).[1]

## DISCUSSION

The Bail Reform Act allows the Court to release a defendant on conditions pending trial when release on personal recognizance or an unsecured appearance bond "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(c)(1). The statute requires the Court to impose the conditions "that the person not commit a Federal, State, or local crime during the period of release" and "that the person cooperate in the collection of a DNA sample from the person if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000." *Id.* § 3142(c)(1)(A).

In addition to these two mandatory conditions, the Bail Reform Act requires the Court to impose the "least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(c)(1)(B). The statute then lists a number of illustrative conditions that may satisfy this requirement. *See id.* § 3142(c)(1)(B)(i)-(xiv). As relevant here, the statute specifically contemplates that the Court may impose conditions that the defendant "abide by specified restrictions on personal associations, place of abode, or travel," *id.* § 3142(c)(1)(B)(iv), "refrain from possessing a firearm, destructive device, or other dangerous weapon," *id.* § 3142(c)(1)(B)(viii), and "satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person

---

[1] The Eastern District of Virginia holds magistrate court at 2:00 p.m., so this Court's 1:00 p.m. calendar is earlier.

and the community," *id.* § 3142(c)(1)(B)(xiv).  Here, the Government's requested conditions fall within these three categories.

The statute further provides that the Court must consider information related to specific factors "in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(g).  These factors include the following: (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* § 3142(g)(1)-(4).  While all factors are relevant to the inquiry,[2] the fourth factor is determinative in this case.

The requested conditions—which are designed to ensure that Speed does not have access to weapons even for a brief period of time and to protect against him committing an act of violence—are necessary because of the nature and seriousness of the danger that Speed poses to the community upon release.  As described in the attached declaration,[3] Speed has engaged in conduct and made statements demonstrating that he poses a threat to public safety.  In the wake of January 6, 2021, Speed purchased at least twelve firearms over the span of a few months and spent more than $50,000 at firearm and firearm-part retailers. *See* Ex. A, ¶¶ 5-7.  This firearm-

---

[2] The Government has not alleged that Speed personally engaged in violence on January 6, and he does not appear to have a criminal history.  But the offenses in this case, although misdemeanors, are still unquestionably serious in light of the events at the U.S. Capitol on January 6, 2021.  And, as someone entrusted by our government with a TS//SCI security clearance, Speed should have known better than to engage in his conduct on January 6.  As described in the affidavit supporting the criminal complaint, the weight of the evidence against Speed is strong.
[3] The attached declaration was signed on June 21, 2022, and was prepared for filing in the Eastern District of Virginia (although, owing to the timing of Speed's arrest and initial appearance, it was not filed).  That is why it is captioned with the name of that court.

buying spree is alarming in light of statements that Speed has made in which he has espoused the use of violence to further his anti-government and anti-Semitic ideologies.

The attached declaration describes some of these statements. As detailed in that declaration, Speed has praised the writings of Eric Rudolph (the 1996 Centennial Olympic Park bomber) and Ted Kaczynski (the "Unabomber"), suggesting that he was studying their writings to learn lessons from them, criticizing their attacks as ineffective, and stating that he was trying to understand them to "come up with a better game plan than they had." *Id.* ¶¶ 12-15. Speed also has criticized being taught the virtues of nonviolence when he was growing up, stating that despite those teachings, "I wanted to join the military and go shoot guns and kill people. It's innate. Imagine how much more could have been accomplished if I hadn't been steered away from that my entire life." *Id.* ¶ 16.

Of particular concern, Speed's statements to an FBI undercover employee at an April 7, 2022 meeting show that he has given a lot of thought to using violence to further his anti-Semitic beliefs. Speed discussed using violence against members of the Anti-Defamation League (ADL) and described how a lot of "enemies" live in the D.C. area. *Id.* ¶¶ 20-21. He said that the ADL promoted the recent anti-lynching bill and that the bill was being passed because "they know things are . . . going to get bad enough, that people like us are going to band together and straight up start lynching people." *Id.* ¶ 20. Speed also criticized "militias" for not having what it takes to actually use violence. *Id.* ¶ 23. He described trying to figure out how to identify potential targets and using a "mock trial" to identify targets he could justify to himself acting against. *Id.* ¶¶ 24-25.

In the same conversation, Speed praised the approach of jihadists and suggested that their approach would be an effective way to "wipe out" the opposition, referring to Jewish people. *Id.*

¶ 26.  Speed discussed how this could be accomplished if three percent of the population each killed one Jewish person (whom he stated made up two percent of the population), stating at one point, "[A]s soon as we pull our trigger against the fucking person, you will succeed, we'd be done.  You have . . . done more than your fair share.  And that's a victory.  Whatever happens after that is icing on the cake."  *Id.*  Speed also explained why he thought that kidnappings would be most effective, stating at one point, "What I would love to see is you take somebody out, and they simply disappear.  Nobody knows what happened to them. . . . We need to foster distrust within the opposite side, just like they do for us. . . . If you leave nothing behind, they never find the body."  *Id.* ¶ 27.

As these chilling statements reflect, Speed has articulated the inclination to use violence.  And his apparent stockpiling of weapons shows that he had developed the means to do so.  Even apart from Speed's own weapons, his current residence contains over two dozen firearms, possessed by his housemates.  While the Government is unaware of Speed using violence to date, there is substantial risk that these charges could prompt Speed to take action.  In light of this particularized risk, the Government's requested conditions—all of which are tailored to preclude Speed from having access to firearms and to impede his ability to commit a violent act—are the least restrictive combination of conditions that will reasonably assure the safety of other people and the community.

As described above, during the search, agents identified, but did not seize, some weapons because they determined that the search warrant permitted the seizure only of certain firearms.  In the ordinary case, a defendant prohibited from possessing weapons pre-trial could surrender the weapons to law enforcement directly.  Here, because of the specific evidence suggesting a potential for violence, the government asks that Speed not be entrusted to possess firearms even

for the purpose of turning them in. The government is concerned about the safety of law enforcement or court officers who would have to collect firearms directly from Speed. Instead, the government proposes that Speed stay away from his residence and storage unit while Pretrial Services and/or law enforcement collects the remaining firearms, which FBI already identified during the execution of the search warrant.

One potential issue may require different treatment. Agents found three National Firearms Act tax stamps indicating that Speed and his out-of-state relative own three silencers but did not find those three silencers during the search. Agents thus will not be able to retrieve them from Speed's house or storage unit without Speed's assistance. If the Court restricts Speed's ability to possess firearms pending trial, Speed cannot possess the silencers. He also cannot legally transfer the silencers to someone else. If Speed chooses not to disclose the location of the three silencers, the government suggests that he be permitted to surrender the silencers directly to Pretrial Services or the FBI.

The government's safety concerns also support its request that Speed not reside at a residence where there are firearms. Agents found approximately 25 firearms at Speed's house, which belong to other individuals living there. If Speed is allowed to keep living at his current residence, it would be too easy for him to access these firearms. The government thus requests that Speed be prohibited from residing at a location in which firearms, destructive devices, or other dangerous weapons are located.

## CONCLUSION

To protect the safety of the community, the Court should release Speed but order that he be subject to home detention with location monitoring. The Court, moreover, should impose additional conditions that he not possess a firearm, destructive device, or other dangerous

7

weapon, and that he not reside at a location in which firearms, destructive devices, or other dangerous weapons are located.  Finally, the Court should order that Speed stay away from his residence until all of his firearms are identified and collected by Pretrial Services and/or law enforcement.

        Respectfully submitted,

        MATTHEW M. GRAVES
        United States Attorney

By:   */s/ Alexis J. Loeb*
        ALEXIS J. LOEB
        CA Bar No. 269895
        Assistant United States Attorney
        (Detailed to USAO-DC)
        U.S. Attorney's Office
        450 Golden Gate Ave., 11th Floor
        San Francisco, CA 94102
        Office: 202-415-7200
        Alexis.Loeb@usdoj.gov